**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRYAN CHERRY, | ) | |
| | ) | Civil Action No. 07-1692 |
| Plaintiff, | ) | |
| | ) | Judge Terrence F. McVerry |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| PRO-SOLUTIONS FOR | ) | |
| CHIROPRACTICS, INC., | ) | Doc. No. 14 |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

I.   **RECOMMENDATION**

It is respectfully recommended that Defendant, Pro-Solutions for Chiropractics, Inc.'s

Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56 (Doc. No. 14) be granted.

II.   **REPORT**

   A.   **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Pro-Solutions for Chiropractics, Inc. ("Pro-Solutions") is in the business of selling

therapeutic and diagnostic materials to chiropractors, including a machine for chiropractic therapy

known as the "Pro-Adjuster." Dr. Maurice Pissiciottano ("Dr. Pissiciottano") is the Chairman and

Chief Executive Officer of Pro-Solutions.  In February 2006, Darnell Turner[1] ("Turner"), an

African-American,  was hired by Edward Bishop ("Bishop), the Director of Operations of Pro-

Solutions, to take over the warehouse operation, which involved shipping and tracking certain

---

[1]Darnell Turner is a former employee of Pro-Solutions who also filed suit against the
defendant claiming discriminatory termination. In Turner's case, Defendant motion for summary
judgment was granted on June 15, 2009; that judgment was recently appealed to the U.S. Court
of Appeals for the Third Circuit, W.D. Pa. C.A. No. 07-1269, Doc. Nos. 37 & 39.

materials, including the Pro-Adjuster, television sets, I-Pods and related materials sent to the customers of Pro-Solutions.  For some period prior to hiring Turner, Pro-Solutions had outsourced the warehouse operation to an independent contractor, Integrated Assembly Systems. (Peresie Dep. at 22, 24.)[2]

On or about May 2006, Turner requested assistance in performing the warehouse functions and recommended the hiring of Bryan Cherry ("Plaintiff" or "Cherry"), also an African-American. (Turner Dep. at 29-31.) Based on Turner's recommendation, Cherry was hired by Pro-Solutions as an assistant to Turner in the warehouse. (Turner Dep. at 31.)   Pro-Solutions also employed a third person in the warehouse, Nicholas Pissiciottano, the brother of Dr. Pissiciottano ("Nick Pissiciottano").  Although Nick Pissiciottano worked in the warehouse, he did not perform the same warehouse functions as Turner and Cherry, but rather, was responsible for configuring the computers for shipment, and customizing them with the software and hardware of the Pro-Adjuster and related products. (Dr. Pissiciottano Dep. at 31; N. Pissiciottano Dep. at 6; Cherry Dep. at 12, 14.)[3]

In September 2006, Richard Erenberg, the owner of  the warehouse where Pro-Solutions

---

[2]Cherry disputes this fact but submits that it is not material.  Cherry fails to cite to any basis or evidence in the record to contradict Pro-Solutions factual statement set forth in paragraph 4 of its Concise Statement of Undisputed Facts (Doc. No. 16).  *See* Pl.'s Answer to Def.'s Stmt. of (Purported) Undisputed Facts in Supp. of its Mot. for Summ. J. (Doc. No. 25), ¶ 4.  Consequently, Cherry has failed to show an issue of fact exists on this point. Fed.R.Civ.P. 56(e)(2).  The Court also finds that this point is relevant to the issue of whether the legitimate, non-discriminatory reason articulated by Pro-Solutions for terminating Cherry was pretextual, and therefore, is material.

[3]Cherry also disputes this fact and submits it is not material, but fails to cite any basis or evidence in the record to contradict Pro-Solutions factual statement in paragraph 15 of Doc. No. 16.  *See* Doc. No. 25, ¶ 15.  Cherry has failed to show an issue of fact exists on this point. Fed.R.Civ.P. 56(e)(2).  The Court further finds that this point is relevant to the issue of whether Plaintiff has established that similarly situated Caucasian employees were treated more favorably than he, an African-American employee.

stored its products and where Turner and Cherry worked, reported to Dr. Pissiciottano that Turner

asked one of Erenberg's employees whether he would be interested in buying a TV out of Pro-

Solution's warehouse. (Dr. Pissiciottano Dep. at 14-15; Erenberg Aff. at ¶¶ 2, 5.)[4] Upon hearing this

information, Dr. Pissiciottano contacted Harry Fruecht, the Chief of Police for Peters Township,

Pennsylvania. (Dr. Pissiciottano Dep. at 15-16; Fruecht Aff at ¶ 2.) Chief Fruecht indicated that

because the warehouse was located in Cecil Township and not Peters Township, it was outside his

jurisdiction and recommended that Dr. Pissiciottano contact the Cecil Township Police. (Dr.

Pissiciottano Dep. at 16; Fruecht Aff. at ¶ 9.) Although Chief Fruecht contacted the Chief of Police

for Cecil Township regarding his discussion with Dr. Pissiciottano (Fruecht Aff. ¶ 10), Dr.

Pissiciottano did not (Dr. Pissiciottano Dep. at 16). In addition, Chief Fruecht recommended that

Dr. Pissiciottano conduct a sting operation to attempt to catch Mr. Turner "red-handed." (Dr.

Pissiciottano Dep. at 16-17; Fruecht Aff. at ¶ 8.) Dr. Pissiciottano was reluctant to proceed with a

"sting"operation, as he was concerned with possible retaliation by Turner, even though Turner had

---

[4]Cherry objects to this statement as being "triple hearsay" and therefore inadmissible.
The Court disagrees.  Rule 56(e) requires that the factual statements set forth in the affidavit be
ones that would be admissible in evidence.  *See J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,* 909
F.2d 1524, 1542 (3d Cir. 1990) (citing *Williams v. Borough of West Chester,* 891 F.2d 458, 466
n. 12 (3d Cir. 1989)).  This means that the evidence does not have to be in admissible form at the
summary judgment stage, but the evidence must be "'capable of being admissible at trial'".
*Robinson v. Hartzell Propeller Inc.,* 326 F.Supp. 2d 631, 645 (E.D.Pa. 2004) (quoting *Philbin v.
Trans Union Corp.,* 101 F.3d 957, 961 (3d Cir. 1996)).  "For example, 'hearsay evidence
produced in an affidavit opposing summary judgment may be considered if the out-of-court
declarant could later present that evidence through direct testimony, i.e., 'in a form that would be
admissible at trial.'"" *Id.* (quoting  *Williams,* 891 F.2d at 466 n. 12).  Here there is no indication
that the witness (Erenberg) would be unavailable to testify at trial and therefore, the Court may
consider the hearsay in Erenberg's affidavit.  *J.F. Feeser,* 909 F.2d at 1542.  Moreover, the
statement would be admissible at trial as it is not being offered to prove that Turner stole TVs
from Pro-Solutions' warehouse.  Here, Pro-Solutions is offering Erenberg's statements to show
how this information affected Dr. Pissiciottano's decision to terminate the warehouse employees,
and not to prove that Turner actually attempted to sell the TV to Erenberg's employee.
Therefore, Erenberg's statement may be considered for this purpose on summary judgment.

never said or done anything to give Dr. Pissiciottano any idea that Turner would retaliate.  (Dr. Pissiciottano Dep. at 17-18.)   Instead, Dr. Pissiciottano decided to shut down the warehouse operation and outsource that function. (Dr. Pissiciottano Dep. at 18.)[5]

On or about September 28, 2006, Bishop informed Turner, Cherry, and Nicholas Pissiciottano that their positions were being eliminated because the decision had been made to outsource the warehouse. (Bishop Dep. at 9-10.) Although he no longer received any compensation after September 28, 2006, Nick Pissiciottano continued to go into Pro-Solutions' warehouse on a sporadic basis over the next ten days, for several hours at a time, to complete several projects that he had been working on, as a favor to his brother.  (Nick Pissiciottano Dep. at 22-24.)[6]

During his employment, Cherry never heard any "racial slurs or anything like that" from either Dr. Pissiciottano or Bishop.  (Cherry Dep. at 20-21, 28.)  Likewise, Turner never heard any racial slurs while he was employed at Pro-Solutions, nor did he believe he was treated any differently than the other employees.  (Turner Dep. at 41-42.)  Cherry and Turner first learned that Bishop and Dr. Pissiciottano allegedly made racial slurs towards them from their attorney.  (Cherry Dep. at 28; Turner Dep. at 41.)  Neither Cherry nor Turner ever heard any such comments from

_____

[5]Although Plaintiff disputes this statement, he fails to identify the specific evidence in the record, *i.e.,* deposition testimony, affidavits or the like, that create a genuine issue of fact on this point.  Moreover, the bases cited by Plaintiff do not contradict Defendant's statement of fact.

[6]Plaintiff disputes this statement of fact and cites in support the deposition testimony of Raymond Hunter, in particular, Hunter's statement that he observed Nick Pissiciottano working at the warehouse after he was supposedly terminated.  Rather than contradict Defendant's factual statement, Hunter's testimony actually supports it on this point.  While Hunter lacks personal knowledge of Nick Pissiciottano's employment status with Pro-Solutions after September 28, 2006, he may testify regarding his personal observations–that he saw Nick Pissiciottano in the warehouse on several occasions over the next couple of weeks after he was allegedly terminated.  Hunter's testimony regarding his personal observations is entirely consistent with Nick Pissiciottano's testimony that he continued to go into the warehouse sporadically over the next ten days to complete a couple of projects as a favor to his brother without compensation.

either Bishop or Dr. Pissiciottano (Cherry Dep. at 20-21; Turner Dep. at 41), nor did anyone at Pro-Solutions ever report to Turner during his employment that they heard Bishop make any such comments (Turner Dep. at 42.)[7]

In the end, Pro-Solutions did not outsource its warehouse operation. (Bishop Dep. at 30; Peresie Dep. at 26.) In October of 2006, Pro-Solutions hired Timothy Linden, a Caucasian male, to work in the warehouse. (Peresie Dep. at 32.) Linden was employed by Pro-Solutions for approximately one month and performed the same job tasks as Turner. (*Id.*) After that, the warehousing function was turned over to existing employees of Pro-Solutions. On approximately November 27, 2006, Pro-Solutions hired Garrett Mudrick, a Caucasian male, to work in the warehouse. (Bishop Dep. at 30; Pereskie Dep. at 33-34; Pro-Solutions letter to EEOC dated 8/24/07 (Doc. No. 28-2) at 2.) Subsequently, Chad Coal, a Caucasian male who was already working as a customer service representative for Pro-Solutions prior to the termination of Turner and Cherry, assisted Mudrick in the warehouse on an as-needed basis, in addition to his customer service duties. (Bishop Dep. at 30-31; Pereskie Dep. at 34-35.)

Raymond Hunter, an employee of one of the other tenants of the warehouse with space

---

[7]Although Plaintiff does not deny these statements, he attempts to raise an issue of fact through a negative inference by arguing that Bishop and Dr. Pissiciottano did not deny using racial slurs aimed at Plaintiff. This is a mischaracterization of Bishop's and Dr. Pissiciottano's testimony. Dr. Pissiciottano testified unequivocally that he never used any racial slurs to refer to Turner or Cherry. (Dr. Pissiciottano Dep. at 22-23.) Dr. Pissiciottano further testified that he did not recall Ed Bishop or any other employee ever referring to Turner or Cherry in a racially derogatory manner in his presence. (*Id.* at 23-24.) Bishop testified unequivocally that he never used racial slurs towards Turner. (Bishop Dep. at 16.) Bishop also testified that he did not recall ever making the comment to anyone referring to Turner and Cherry as the two guys in the warehouse who have tans. (*Id.*) The Court finds that no reasonable jury could conclude from this testimony that either Bishop or Dr. Pissiciottano did not deny using racial slurs aimed at Plaintiff. "Not recalling" is an entirely different response than "not denying" using racial slurs, especially when coupled with the modifier "ever."

adjacent to Pro-Solutions, came into contact with Pro-Solutions' warehouse employees on a daily basis. (Hunter Dep. at 9; Hunter Aff. ¶¶ 7-8.) From his location in the warehouse, Hunter was able to observe some of the activities in Pro-Solutions warehouse. (Hunter Dep. at 13.) Hunter testified that he observed Nick Pissiciottano working at Pro-Solutions warehouse on numerous occasions after he had allegedly been terminated. (Hunter Aff. ¶ 13; Hunter Dep. at 13.) What follows is disputed by the parties, but the evidence will be viewed in the light most favorable to Cherry as the non-moving party. Shortly after Turner, Cherry and Nick Pissiciottano were terminated by Pro-Solutions, Hunter claims that he had a conversation with Nick Pissiciottano, wherein Nick allegedly told him:

> [I]t was messed up what happened to [Cherry] and them, and that [Cherry] should fight it because he thinks it was wrong that [Dr. Pissiciottano] fired him, his brother fired him for no reason. . . . [Nick] said that he was – Like, he didn't – He didn't think that his brother got along with, you know, he didn't do well with black people. And he said he thought he was scared of [Turner]. . . . and that I should tell [Cherry] he should fight it because he would have a good chance of wining. He should get a lawyer.

Hunter Dep. at 10; *see also* Hunter Aff. ¶¶ 9-10. Hunter also claims that Nick told him that the reason his brother gave to Turner and Cherry for their termination, that their positions were being eliminated, was false. (Hunter Aff. ¶ 11.)[8]

Subsequently, on December 11, 2007, Cherry instituted the present action alleging that his employment was unlawfully terminated on the basis of his race, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1), 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act, 43 P.S. §§ 951, 955(a). Discovery is now closed and Pro-Solutions has filed the summary

---

[8]Nick Pissiciottano denies that this conversation with Raymond Hunter ever took place or that he made any such statements. (N. Pissiciottano Dep. at 32-33.)

judgment motion currently before the Court. Said motion has been fully briefed and responded to, and thus, is ripe for disposition.

## B.   STANDARD OF REVIEW

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED.R.CIV.P. 56(e)) (emphasis added by *Matsushita* Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## C.   ANALYSIS

In support of  its motion for summary judgment, Pro-Solutions initially argues that Plaintiff has failed to prove, by either direct or circumstantial evidence, that Pro-Solutions intentionally discriminated against him based on race when it decided to terminate his position.  Pro-Solutions

further contends that Cherry has failed to establish a *prima facie* case of discrimination based on race under the *McDonnell-Douglas* burden-shifting test. Moreover, even if Cherry had been able to establish a *prima facie* case of discrimination, Pro-Solutions submits that it has articulated legitimate non-discriminatory reasons for terminating Cherry.  In opposing the motion for summary judgment, Cherry advances five arguments: (1) based on established precedent, where the state of mind of the employer and the employer's intent are at issue, that question is for a jury to resolve and is not appropriate for resolution on summary judgment; (2) based on precedent from the court of appeals in this circuit, where the credibility of the material witnesses is at issue, that question should likewise be submitted to the jury, and not resolved on summary judgment; (3) direct evidence exists to show that his firing was based on his race; (4) the evidence of record establishes a *prima facie* case of discrimination based on race and overwhelming evidence of pretext to discredit and disprove the employer's proffered legitimate, non-discriminatory reasons for the firing; and (5) numerous genuine issues/disputes of material fact exist which require denial of Defendant's summary judgment motion.

Each of Cherry's arguments is addressed below in turn.

### 1.    <u>Appropriateness of Summary Judgment</u>

Cherry's first two arguments can be addressed together in fairly short fashion.  Initially, Cherry seeks to defeat the summary judgment motion by arguing that it would be improper for this Court to grant summary judgment because the state of mind of the employer, the employer's intent and the credibility of material witnesses are at issue in this case, and cites in support *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007), and *Pullman-Standard v. Swift*, 456 U.S. 273, 290 (1982). Cherry submits that these cases stand for the proposition that it is improper for this Court to grant

summary judgment on issues that are for the fact finder, the jury, to resolve.  In response, Pro-Solutions submits that Cherry has taken these cases out of context, arguing that if the cited precedent actually supported his proposition, then summary judgment would never be appropriate in a racial discrimination case.

An examination of the relevant language in *Wishkin* reveals that the court of appeals was discussing the appropriate standard of review for a summary judgment motion in a discrimination case under the Rehabilitation Act.  In articulating the standard, the court of appeals opined that "issues such as intent and credibility are rarely suitable for summary judgment."  *Wishkin*, 476 F.3d at 184 (citing *Pullman-Standard,* 456 U.S. at 290).  However, the court of appeals did not decide at that point that summary judgment should be denied.  Rather, the court of appeals proceeded to analyze plaintiff's claim under the familiar *McDonnell-Douglas* burden shifting framework.[9]  At step three of that test, the court of appeals determined, based on the evidence proffered by the parties, that a genuine issue of fact existed as to the employer's real motive in terminating the plaintiff.

Thus, *Wishkin* does not stand for the proposition that summary judgment must be summarily denied without reviewing the evidence, or lack thereof, proffered by the parties, whenever an employer's motive for the adverse employment action is at issue.  If that were the case then, as Pro-Solutions suggests, summary judgment would never be granted in a case of discrimination.  Therefore, the Court finds it is necessary to review the evidence adduced by the parties in respect to the elements of Cherry's discrimination claim, in order to determine whether a genuine issue of

---

[9]The court of appeals in *Wishkin* further held that "the existence of a prima facie case of employment discrimination is a question of law that must be decided by the court but the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." *Id*. at 185 (citing *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797-98 (3d Cir. 2003) (*per curiam*)).

fact exists precluding summary judgment.[10]  Accordingly, the Court declines Cherry's invitation to summarily deny Pro-Solutions' motion for summary judgment without considering the evidence of record.[11]

### 2.        Direct Evidence of Discrimination

In opposition to summary judgment, Cherry asserts that direct evidence of racial discrimination exists in this case. To prove race discrimination through direct evidence, the plaintiff must provide evidence that demonstrates that the "'decision makers placed substantial negative reliance on an illegitimate criterion in making their decision.'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 786 (3d Cir. 2007) (quoting *Anderson v. Consol. Rail Corp.,* 297 F.3d 242, 248 (3d Cir. 2002)). The evidence must be so revealing of discriminatory animus that it is unnecessary to

_____

[10]The other cases cited by Cherry on page 4 of his brief–*Webb v. Merck & Co., Inc.*, 450 F.Supp.2d 582 (E.D.Pa. 2006), and *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29 (2d Cir. 1994)–are also quoted out of context.  With regard to *Webb,* the quote cited by Cherry came from the court's discussion of the elements of a hostile work environment claim.  *See* 450 F.Supp. 2d at 596.  Moreover, with regard to the disparate treatment claim, the *Webb* court granted summary judgment in favor of the employer, finding the plaintiff "ha[d] not presented sufficient direct or circumstantial evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race or his prior discriminatory discipline was a motivating factor in [the employer's] decision to terminate his employment." *Id.* at 604 (citing *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101 (2003)).  As to the quote Cherry cited from the *Chambers* case*,* that language came from the court of appeals' discussion of the difficulty an employee usually encounters in obtaining *direct* evidence of discrimination, and thus, is usually forced to rely on circumstantial evidence.  43 F.3d at 37.  Neither case supports denying summary judgment merely because an employer's motive or witnesses' credibility is at issue, without even examining the proffered evidence.

[11]Cherry's argument is unavailing for another reason–he has failed to provide any substantive or meaningful analysis of his argument.  For example, with regard to the material witnesses' credibility, he fails to even provide the identity of these witnesses or any basis for why their credibility is at issue.  The Court is not required to consider such undeveloped arguments. *See Massie v. U.S. Dep't of Housing & Urban Dev.,* Civ.A.No. 06-1004, 2007 WL 184827, *3 (W.D.Pa. Jan. 19, 2007), *vacated in part on other grounds on reconsideration,* 2007 WL 674597 (W.D.Pa. Mar. 1, 2007) (citing *Pennsylvania v. U.S. Dep't of Health & Human Serv.,* 101 F.3d 939, 945 (3d Cir. 1996)).

rely on any presumption from a *prima facie* case to shift the burden of production. *Id.* (citing *Anderson*, *supra*). Thus, "'[o]nly the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence.'" *Id.* (quoting *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1223 (11th Cir. 1992)).[12]

Under this test, the so-called "direct" evidence of conspicuous discrimination proffered by Cherry falls way short of the mark.  First, Cherry contends that Nick Pissiciottano, a Caucasian employee who was allegedly terminated with him and Turner,  was not actually terminated by Pro-Solutions because he continued to work for Pro-Solutions after he was "supposedly 'fired.'" Defendant counters that Cherry's allegation is simply inaccurate, for two reasons. The undisputed evidence shows that (1) although Nick Pissiciottano physically performed his work in the warehouse, his position and responsibilities were entirely different than that of Cherry and Turner, and therefore, they were not similarly situated employees; and (2) Nick Pissiciottano *voluntarily* came into the warehouse after his termination for a brief period  to complete several projects configuring software, *but without compensation*, as a favor to his brother, Dr. Pissiciottano.  After examining the record evidence, the Court agrees with Defendant.  It is clear that Nick Pissiciottano is not a similarly situated employee because his position and responsibilities were entirely different that those of Cherry and Turner.  Moreover, because Hunter was not an employee of Pro-Solutions, and has not otherwise demonstrated that he has personal knowledge of Nick Pissiciottano's employment status on the days he saw him in the warehouse after he was allegedly terminated,

_____

[12] In addition to his Title VII claim, Cherry also asserts violations of 42 U.S.C. § 1981 and the Pennsylvania Human Relations Act, 43 P.S. § 955(a). Because the latter two claims involve the same elements of proof as the Title VII claim, the same legal analysis applies to those claims as well.  *Johnson v. St. Luke's Hosp.,* 307 Fed. App'x 670, 671 n.1 (3d Cir. 2009) (citing *Lewis v. Univ. of Pittsburgh,* 725 F.2d 910, 915 n. 5 (3d Cir. 1983)).

Hunter's testimony regarding Nick Pissiciottano's employment status would not be admissible in court.[13]   Nevertheless, Hunter may testify as to his first hand observations, including Nick Pissiciottano's presence at the warehouse following his termination. This observation is entirely consistent with the testimony of Nick Pissiciottano and Dr. Pissiciottano. Nick Pissiciottano testified that he worked unpaid intermittently for up to 10 days after his termination/resignation[14] in order to tie up any loose ends.  (N. Pissiciottano Dep. at 24, 31-33.) Therefore, even in the light most favorable to Cherry, the fact that Hunter observed Nick Pissiciottano in the warehouse after his termination is not direct evidence of racial animus, as Cherry and Nick are not similarly situated and, in any event, the admissible portion of Hunter's testimony is entirely consistent with the testimony of Nick Pissiciottano and Dr. Pissiciottano.

Second, Cherry points to Hunter's testimony about the statements that Nick Pissiciottano allegedly made to  Hunter about the true reason behind the termination of Cherry and Turner as direct evidence of racial animus.  In particular, Cherry seeks to use Hunter's statements, in his affidavit and deposition, of what Nick Pissiciottano allegedly told him regarding the true reason for

---

[13]Statements made in an affidavit or deposition which  are not capable of being reduced to admissible evidence at trial may not be considered in opposition to a motion for summary judgment. *See Capital Funding v. Chase Manhattan Bank USA,* 191 Fed. Appx. 92, 96 (3d Cir. 2006); *Williams v. Borough of West Chester,* 891 F.2d 458, 466 n. 12 (3d Cir. 1989). Under FED.R.CIV.P. 56(e), the requirements for admissibility of an affidavit are that the "affidavit must be made on personal knowledge, set out facts that must be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Similarly, FED.R.EVID. 602 requires that a witness testify from personal knowledge.

[14]While a number of witnesses, such as Bishop (Bishop Dep. at 9) and Dr. Pissiciottano (Dr. Pissiciottano Dep. at 36), stated in their depositions that Nick Pissiciottano was terminated at the same time as the other warehouse employees, Nick Pissiciottano testified that he had resigned from Pro-Solutions because he had accepted another job. (Nick Pissiciottano Dep. at 35.) However, the resolution of Pro-Solutions' summary judgment motion does not turn on this issue.

Cherry's termination–that "it was messed up what Pro-Solutions did to [Cherry], and that he should get a lawyer and fight it"; and that Nick told Hunter that his brother, Dr. Pissiciottano, "did not 'do well' around black people." Pro-Solutions objects to this evidence on two grounds.  First, Pro-Solutions argues that allegedly not doing well around black people, whatever that may mean, does not by itself suggest a racial motivation for Cherry's termination.  Second, and more importantly, Pro-Solutions contends that Cherry is attempting to use this so-called testimony to prove the truth of the matter asserted, *i.e.,* to show that Dr. Pissiciottano was allegedly prejudiced against blacks and that Cherry's termination was somehow improper.  Therefore, according to Pro-Solutions, Hunter's testimony constitutes inadmissible hearsay and cannot be considered in deciding the summary judgment motion, based on FED.R.EVID. 801(c), and *Stahley v. Guardian Life Ins. Co. of Am.*, Civ.A.No. 07-1873, 2008 U.S. Dist. LEXIS 56470, *7-8 n. 3 (E.D.Pa. July 23, 2008) (quoting *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n.1 (3d Cir. 1996) ("[a] hearsay statement . . . is not capable of being admissible at trial, and [can] not be considered on a motion for summary judgment")).  Cherry counters that Hunter's statements are admissible under one of the hearsay exceptions, as Nick Pissiciottano's alleged statement was "a statement by the party's agent, or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]" FED.R.EVID. 801(d)(2)(D).  In reply, Pro-Solutions argues that the party admission exception to the hearsay rule is not applicable here because (1) Nick Pissiciattano had resigned from his position with Pro-Solutions prior to the termination of Cherry (N. Pissiciottano Dep. at 21),[15] and therefore, was not an agent of Pro-Solutions on the date of the

---

[15]Although Pro-Solutions cites to page 21 in Nick Pissiciottano's deposition, it did not include that page in either its original or supplement appendices in support of its summary judgment motion.

alleged conversation between Nick and Hunter; and (2) even if Nick was still employed at the time of the alleged conversation, any such statements of his alleged opinions would not have been within the scope of his employment.

The Court finds that Hunter's testimony regarding Nick Pissiciottano's alleged remarks made to him regarding the true reasons for Cherry's termination constitutes inadmissible hearsay which does not fall within the exception of FED.R.EVID. 801(d)(2)(D).  Regardless of whether he resigned or was terminated, it is clear that Nick Pissiciottano was not an employee on the day that he allegedly talked to Hunter, as he was no longer receiving compensation from Pro-Solutions after September 28, 2006.  Moreover, even if he had been employed at the time of his alleged remarks to Hunter, said remarks were not concerning a matter within the scope of any such agency or employment.  Accordingly, the Court finds that Cherry has failed to show that Hunter's statements fall within the party admission exception to the hearsay rule under  FED.R.EVID. 801(d)(2)(D).  In addition, the Court notes that although "hearsay evidence produced in sworn testimony opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony," *see Williams v. Borough of West Chester*, 891 F.2d 458, 466 n. 12 (3d Cir. 1989), the version of events presented by Hunter's testimony has been denied by Nick Pissiciottano. Hence, Cherry cannot cure the inadmissability of the evidence by placing Nick Pissiciottano on the stand. Consequently, Hunter's allegations about what Nick Pissiciottano allegedly stated to him would be inadmissible at trial, and thus, may not be considered by this Court in ruling on Defendant's motion for summary judgment.

The third and final category of evidence that Cherry asserts constitutes direct evidence of discriminatory animus is based upon a negative inference derived from the testimony of the

decision-makers in his termination, Bishop and Dr. Pissiciottano.  In particular, Cherry points to the following evidence: (1) Bishop and Dr. Pissiciottano did not deny that they used racial slurs towards him and Turner, (2) Dr. Pissiciottano admitted using a racial slur in the past but not in a derogatory fashion, and (3) there is a clear inference that by refusing to answer a question related to the racial slurs, Bishop had indeed used racial slurs in referring to black warehouse employees.  In response, Pro-Solutions counters that the allegation that Bishop and Dr. Pissiciottano made racial slurs directed to Cherry or that they were prejudiced against blacks is simply false.  Pro-Solutions further submits that Plaintiff's own testimony belies his allegation.  In any event, Pro-Solutions maintains there is no evidence linking the alleged racial slurs chronologically to the termination of Cherry. Pro-Solutions argues that to be probative of discrimination, isolated comments must be contemporaneous with the termination to establish a causal link, citing *Geier v. Medtronic, Inc.,* 99 F.3d 238, 242 (7th Cir. 1996), and Plaintiff has failed to establish such link.

      As a preliminary matter, the Court notes that a negative inference does not rise to the level of blatant, conspicuous, non-presumptive conduct required to satisfy the direct evidence test.  That being said, the Court finds that the testimony of Bishop and Dr. Pissiciottano, as proffered by Cherry, does not support an inference of discriminatory intent. First, Cherry  mischaracterizes this testimony.  Dr. Pissiciottano testified unequivocally that he never used any racial slurs to refer to Turner or Cherry.  (Dr. Pissiciottano Dep. at 22-23.)  Dr. Pissiciottano further testified that he did not recall Ed Bishop or any other employee ever referring to Turner or Cherry in a racially derogatory manner in his presence.  (*Id.* at 23-24.)  Bishop testified unequivocally that he never used racial slurs towards Turner.  (Bishop Dep. at 16.)  Bishop also testified that he did not recall ever making the comment to anyone referring to Turner and Cherry as the two guys in the warehouse

who have tans.  (*Id.*)  Cherry's own testimony supports this–he testified that he was not subject to any racial slurs when working at Pro-Solutions, as did  Turner.  In fact, Cherry and Turner testified that they first learned that Bishop and Dr. Pissiciottano allegedly made racial slurs towards them from their attorney.  Based on this evidence, the Court finds that no reasonable jury could infer that Bishop or Dr. Pissiciottano made racial slurs aimed at Plaintiff.  "Not recalling" is not the linguistic equivalent of "not denying" or of "admitting."  Further, Dr. Pissiciottano's admitted use of a racial slur not directed to Plaintiff or any employees at Pro-Solutions many years prior to Cherry's termination, is, at most, a stray remark, and therefore, is not indicative of discriminatory animus in the termination of Plaintiff.  *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) (holding that "stray remarks by . . . decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.")(citation omitted).[16]  Finally, there is no basis for contending that a reasonable adverse inference that Bishop used racial slurs against the black warehouse employees can be drawn from the refusal of counsel to permit Bishop to answer a question related to racial slurs.[17]

---

[16]During questioning  regarding his use of racial slurs at his deposition, Dr. Pissiciottano was asked if he ever used the term "nigger" in referring  to either Turner or Cherry.  (Dr. Pissiciottano Dep. at 22-23.)  Dr. Pissiciottano responded that he did not and that he "never used that term derogatorily."  (*Id.*)  When asked if he ever used that term in a non-derogatory fashion, Dr. Pissiciottano responded: "I grew up in McKeesport, played sports.  That's a term that gets thrown around in the locker room all the time, but never in a derogatory fashion."  (*Id.*)  Even treating Dr. Pissiciottano's testimony as an admission of prior use of racially offensive language, such remarks occurrred many years prior to Cherry's employment and subsequent termination, and thus are unrelated to the decision to terminate Cherry.  *See Ezold*, 983 F.2d at 545.

[17]During Bishop's deposition, Plaintiff's counsel asked him if he "could have" made a certain racial slur after Bishop had stated that he could not recall making the statement. Defense counsel refused to permit Bishop to answer the question because he believed the question to be "wholly-speculative" and thus improper. However, Cherry argues that the objection by defense counsel was improper.  Even if it were reasonable to make such an inference, it would not rise to the level required for direct evidence of discriminatory animus, that is, such an inference would

In summary, the Court finds that  direct evidence of discriminatory animus, that would be so revealing as to negate the need for burden shifting, clearly does not exist based on the record evidence.

### 3.        The *McDonnell Douglas* Burden Shifting Analysis

Absent direct evidence of racial animus, Cherry's race discrimination claims are scrutinized under the familiar burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Initially, the plaintiff bears the burden of establishing a *prima facie* case by demonstrating that (1) he is a member of a protected class, (2) he is qualified for the position, (3) he suffered an adverse employment action, and (4) members outside the protected class were treated more favorably. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999). The question of whether a plaintiff has established his *prima facie* case is a question of law to be determined by the court. *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003).  If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *Id*. (citing *McDonnell Douglas,* 411 U.S. at 802). Once the employer carries its burden, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were not the true reasons, but were merely a pretext for discrimination. *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

It is undisputed that Cherry has satisfied three of four elements of a *prima facie* case of discrimination. First, Cherry is black/African-American and thus, is a member of a protected class. Secondly, Cherry was qualified for the warehouse position.  Thirdly, Cherry was terminated on

---

not demonstrate that the "decision makers placed substantial negative reliance on an illegitimate criterion in making their decision." *Jakimas*, 485 F.3d at 786.

September 28, 2006, and thus, suffered an adverse employment action.

However, the parties dispute whether Cherry has satisfied the fourth element. Cherry contends that four circumstances suggest intentional discrimination: (1) the Caucasian warehouse employee, Nick Pissiciottano, was not actually terminated; (2) Nick Pissiciottano's statements to Hunter regarding the alleged real reason Cherry and Turner were terminated; (3) the racial slurs allegedly used against Cherry and Turner; and (4) the fact that the black warehouse employees were replaced by a white employee, Eric Linden. As discussed earlier, the record clearly shows that Nick Pissiciottano was not "supposedly 'fired,'" but was actually terminated (or resigned) and, in any event, was not similarly situated to Cherry; neither Dr. Pissiciottano nor Bishop used or recalled using racial slurs against the black warehouse employees; and Cherry and Turner were not aware of any racial slurs directed at them during their employment. Additionally, as discussed earlier, Hunter's testimony regarding the conversation he allegedly had with Nick Pissiciottano is inadmissible hearsay. Nevertheless, according to the record, a Caucasian male, Eric Linden, was hired, shortly after the termination of the three warehouse employees, to do the work that the black warehouse employees had been performing, and worked at Pro-Solutions for approximately a month. (Bishop Dep. at 30; Peresie Dep. at 32.) At the *prima facie* stage of the analysis, the hiring of Linden is sufficient to give rise to an inference of discrimination and satisfy the fourth element of a *prima facie* race discrimination case. *See Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 n. 1 (3d. Cir. 1988) (stating that the *prima facie* case is rarely the focus of the ultimate disagreement because it is easily made out).

In order to rebut the presumption of discrimination, Pro-Solutions, in turn, offers two legitimate, non-discriminatory reasons for the termination: (1) Dr. Pissiciottano received information

that Turner was attempting to sell a Pro-Solutions' TV to an employee of the warehouse owner, and Cherry failed to report him; and (2) Pro-Solutions was exploring the outsourcing of its warehousing function. As to the first reason, the record supports this as set forth on pages 2 through 4 herein. As to the second reason, the record shows that outsourcing the warehousing function was an alternative that had been subject to discussion among the Pro-Solutions management team from time to time. Indeed, prior to hiring Turner and Cherry, Pro-Solutions had outsourced the warehousing function.

Since Pro-Solutions has met its burden at the second step of the *McDonnell Douglas* analysis, the burden now shifts back to Cherry to show that the legitimate, non-discriminatory reasons articulated by Pro-Solutions are pretextual. To survive a motion for summary judgment at the third step of the burden shifting analysis, Cherry must present some evidence from which a reasonable jury could either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11 (1993); *Ezold,* 983 F.2d at 523). The court of appeals further explained the quantum of proof required at the third step:

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Fuentes v. Perskie,* 32 F.3d at 765 (quoting *Ezold,* 983 F.2d at 531) (other internal quotations

omitted).

Cherry attempts to show that the two reasons articulated by Pro-Solutions are merely pretextual by pointing to certain evidence in the record which he claims supports a finding of pretext, or at least raises a genuine issue of material fact on pretext.  First, Cherry submits ten facts that he contends provide evidence that the outsourcing reason is pretextual:  (1) the warehouse work was not ultimately outsourced; (2) neither Cherry nor Turner ever heard any mention of outsourcing at the daily/weekly meetings; (3) Hunter's testimony and affidavit regarding Nick Pissiciottano's alleged statement that the reason given for Cherry's termination was false and the real reason was race; (4) the decision makers non-denial of use of racial slurs; (5) the adverse inference from Bishop's refusal to answer a question during his deposition regarding his recollection of using racial slurs directed at black warehouse employees; (6) Pro-Solutions' inconsistent reasons for Cherry's termination; (7) Pro-Solutions failure to produce any documents during discovery evidencing any problems with the warehouse work staying in-house; (8) outsourcing warehouse jobs was not included as a reason for Cherry's termination in Pro-Solutions' EEOC Position Statement; (9) Nick Pissiciottano, a Caucasian warehouse employee, was not fired; and (10) Cherry was immediately replaced by a Caucasian employee.  As discussed below, the Court finds the evidence proffered by Cherry does not establish that Pro-Solutions' outsourcing reason was pretextual, or even raises a genuine issue of material fact.

Four of Cherry's asserted facts proffered o discredit Pro-Solutions' outsourcing reason can be disposed of quickly.  With regard to asserted facts 3, 4, 5 and 9, this evidence was already discussed and rejected for the reasons stated above.  Next, as to asserted facts 1, 2, and 7,  it is uncontested that Pro-Solutions ultimately decided not to outsource its warehouse operation and that

outsourcing was never discussed at meetings attended by Cherry and Turner.  However, the record does indicate that the outsourcing of the warehouse operation was something that was frequently discussed by management of Pro-Solutions, and that prior to hiring Turner and Cherry, the warehouse operation had been outsourced.  Further, contrary to Cherry's assertions, two completely plausible explanations exist for not  including him in discussions about possible outsourcing of warehouse operation: (1) his position would be eliminated and (2) this decision is one typically made by management, not warehouse employees.  Thus, even in the light most favorable to Cherry, the fact that Pro-Solutions did not ultimately choose to go through with outsourcing is not, by itself, indicative of an intent to discriminate, because it was based on a business judgment–whether to terminate Cherry for his alleged complicity in the attempt to sell Pro-Solutions' merchandise.  *See Billet v. CIGNA Corp.,* 940 F.2d 812, 825 (3d Cir. 1991) ("Barring discrimination, a company has the right to make business judgments on employee status, especially when the decision involves subjective factors deemed essential to certain positions." (citing *Healy,* 860 F.2d at 1220)), *overruled on other grounds in St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993).

As to asserted facts 6 and 8, the Court finds no support for Cherry's argument in the record.  Indeed, an examination of the Position Statement Pro-Solutions filed with the EEOC belies Cherry's argument.  The Position Statement reveals that Pro-Solutions stated to the EEOC that outsourcing its warehouse function was the reason communicated to Cherry for his termination. (Pl.'s App. in Opp'n Summ. J. (Doc. No. 22), Ex. 7.)[18]  Additionally, Pro-Solutions explained to the EEOC why it decided to outsource the warehouse operation, as opposed to confronting Turner and Cherry

---

[18]Specifically, in its Position Statement to the EEOC, Pro-Solutions stated that Dr. Pissiciottano  "told [the terminated employees] that the warehouse function was to be outsourced again," and that "[s]teps were taken to affect such an outsourcing."  (*Id.*)

21

regarding Turner's attempt to sell its televisions. Therefore, Cherry has failed to show, through Pro-Solutions' Position Statement to the EEOC, or any other record evidence, that Pro-Solutions' reasons were inconsistent.

Finally, as to asserted fact 10, the fact that Pro-Solutions hired a Caucasian employee approximately one week after terminating Cherry to work in its warehouse does not alone show pretext. While such evidence may have been sufficient at the *prima facie* stage of analysis, it is not sufficient at stage three. *Simpson*, 142 F.3d at 646.

Turning to the Pro-Solutions' other articulated, non-discriminatory reason–the attempted theft of its televisions–Cherry's proffered evidence of pretext can be condensed into three arguments: (1) an inconsistency in Pro-Solutions' articulated reason is demonstrated by Cherry not being informed either prior to, at the time of, or after his termination, that the alleged theft of Pro-Solutions' merchandise and his failure to report it to his supervisor, were the real reasons for his termination; (2) Cherry was never approached by his supervisors regarding his involvement, if any, in the theft of Pro-Solutions' merchandise; and (3) Pro-Solutions consented to Cherry receiving unemployment compensation benefits, as well as to an extension of those benefits. For the reasons that follow, the Court finds that the evidence proffered by Plaintiff does not establish that Pro-Solutions' second articulated reason was pretextual, or even raises a genuine issue of material fact.

With regard to his first and second arguments, Cherry appears to be arguing that a reasonable jury could infer from the mere fact that he was never informed of the attempted theft and his alleged complicity in it that the real reason for his termination was his race. However, the record evidence does not support such an inference. Dr. Pissiciottano explained that the attempted theft of Pro-Solutions' property was not mentioned to Cherry and Turner because he feared retaliation from

Turner against his business and family.  Cherry has failed to demonstrate any weakness or implausibility in Defendant's proffered reason.  Instead, Cherry attempts to argue that Defendant's reason is unfounded because it relies on inadmissible hearsay via Erenberg's statements in his affidavit.  However, as discussed earlier, Erenberg's statements are not hearsay because they are not being offered to prove the truth of the matter asserted.  Rather, Erenberg's statements are being offered to show how this information affected Dr. Pissiciottano's decision to terminate Cherry.

As to his third argument, Cherry contends that Pro-Solutions' failure to contest Cherry's claim for unemployment compensation benefits is also evidence of pretext.  Although he does not expound upon his legal theory, which in and of itself is fatal,[19] Cherry appears to suggest that because Defendant did not contest his unemployment compensation claim, Defendant's alleged theft reason is less believable.  Failing to contest Cherry's claim for unemployment compensation does not, in this Court's view, discredit Defendant's attempted theft reason.  Rather, Defendant's failure to contest Cherry's unemployment compensation claim is consistent with the fact that it had lacked information regarding Cherry's actual role in the alleged attempted theft.  Therefore, Defendant had no real basis to contest his unemployment compensation claim.  However, that does not change the fact that Defendant possessed evidence that the alleged theft attempt did occur, which impacted Dr. Pissiciottano's decision to terminate the warehouse employees.  Pro-Solutions had two legitimate, non-discriminatory explanations for terminating Cherry and, as explained above, Defendant chose to inform Cherry only of the outsourcing reason, to avoid a confrontation with the warehouse employees and possible retaliation from Turner.

In conclusion, Cherry has failed to meet his burden of presenting evidence from which a

---

[19]*See* Note 11, *supra.*

reasonable jury could (1) disbelieve Pro-Solutions' articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Pro-Solutions' decision to terminate him.  Moreover, Cherry has failed to demonstrate that a genuine issue of material fact exists to preclude summary judgment against him.[20]  Accordingly, the Court recommends that the motion for summary judgment filed by Pro-Solutions be granted.

## III.   CONCLUSION

For the reasons articulated above, it is recommended that the Motion for Summary Judgment (Doc. No. 14) filed by Defendant, Pro-Solutions for Chiropractic, Inc.,  be granted.

In accordance with the Magistrates Judges Act, 28 U.S.C.  § 636 (b) (1) (B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.


Dated: August 17, 2009                    By the Court:


                                          LISA PUPO LENIHAN
                                          United States Magistrate Judge


cc:     Honorable Terrence F. McVerry

---

[20]Plaintiff also asserts that a genuine dispute exists with regard to six material facts, thus precluding summary judgment in favor of Pro-Solutions.  (Pl.'s Br. Opp'n Summ. J. (Doc. No. 20), at 14.)  However, the Court has already discussed each of these six facts elsewhere in this report and recommendation and determined that the evidence was not sufficient to raise a genuine dispute.

United States District Judge

All Counsel of Record
*Via Electronic Mail*